**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**                      **Criminal Action No. 1:15-CR-30**

**GREGORY N. CASON**

        **Defendant.**

## MEMORANDUM OPINION AND REPORT AND RECOMMENDATION

On July 20, 2015, came Defendant, Gregory N. Cason, in person and by counsel, William A. Kolibash and Edmund J. Rollo. Also came the United States of America, represented by Assistant United States Attorney Robert H. McWilliams, Jr., pursuant to Defendant's Motion to Suppress Statement (Docket No. 17).

## I.  RELEVANT PROCEDURAL AND FACTUAL BACKGROUND

On March 03, 2015, the Grand Jury indicted Defendant on three counts: one count of Conspiracy to Defraud the United States, pursuant to 18 U.S.C. § 371; and two counts of Fraud and False Statements, pursuant to 26 U.S.C. § 7206(2) and Aiding and Assisting in the Preparation and Filing of False Tax Forms, pursuant to 18 U.S.C. § 2. (Docket No. 1.) On March 24, 2015, Defendant appeared before the undersigned and entered a plea of not guilty to all counts of the indictment. (Docket No. 10.) On April 06, 2015, this case was designated as complex. (Docket No. 13.) Defendant filed the instant Motion on June 30, 2015, moving the Court to suppress statements that Defendant allegedly made to Internal Revenue Service ("IRS") agents. (Docket No. 17.) The United States filed its response on July, 07, 2015. (Docket No. 26.) Oral argument on this matter was heard on July 20, 2015.

## II.  CONTENTIONS OF THE PARTIES

Defendant

1.    Defendant was initially misled as to the nature of the interrogation.

2.    Defendant was placed in custody of the IRS agents shortly before leaving his home and kept in custody throughout the interrogation.

3.    Defendant was not given his Miranda warning prior to the interrogation.

4.    The interrogation violates both the Fifth Amendment of the Constitution and IRS administrative policy, as such statements resulting from the interrogation must be suppressed.

The United States

1.    Defendant was advised immediately that he was the subject of the investigation.

2.    Defendant was told that he had the rights to remain silent, end the interview at any time, and consult with an attorney.

3.    Defendant was not in the IRS agents' custody at any time during the interview.

4.    The IRS administrative policy cited by Defendant is non-applicable to an IRS "grand jury investigation."

## III.  RELEVANT FACTS

### A. Undisputed Facts

The following facts are undisputed. On June 3, 2010, IRS Special Agents Jason Gandee and Matthew Schommer (collectively, "the Agents") went to the house of Defendant at approximately 7:30 AM in order to conduct an interview with Defendant and execute a search warrant on Defendant's office. (Tr. P. 45-46.) At approximately the same time, other IRS agents were executing warrants related to the investigation at other locations in Morgantown, West Virginia. (Tr. P. 55-56.)

The agents were carrying their sidearms, though nothing in the record indicates that the weapons were ever drawn. (Tr. P. 58.) The agents were in suits, not raid gear. (Tr. P. 70; 110.)

At the time that the Agents arrived, Defendant, his wife Michell ("Shelly") Cason, and their three daughters were present in the house. (Tr. P. 67.) Upon arrival, the Agents identified themselves as IRS agents, showed their badges to Defendant, and agreed to Defendant's request that the Agents wait on the porch with Defendant until his youngest (twin) daughters left for school. (Tr. P. 83; 112.) Defendant's twin daughters left shortly after the arrival of the Agents. (Tr. P. 68-69.) After approximately twenty minutes at Defendant's residence, the Agents drove Defendant to his office. (Tr. P. 88.)

Upon arriving at the office, Defendant unlocked the door and let the Agents and approximately five or six other agents into his office. (Tr. P. 89.). Once inside the office, Defendant was taken into a conference room, the door was shut, Defendant was shown the warrant, and asked to review and make statements on several tax records with the Agents. (Tr. P. 91, 93; Docket No. 18, Ex.1.)[1] During the interview, Defendant was asked to listen to a recorded tape, in which he is alleged to have made incriminating statements. (Tr. P. 97.) At this point, Defendant ended the interview and contacted counsel. (Tr. P. 98.)

Throughout the conference room interview, Defendant received two phone calls from attorney Edmund Rollo on his cellular phone, left the conference room freely to make multiple phone calls to his wife, Rollo, and attorney John Wiley (who would ultimately come to the office for a brief

---

[1] The statements made in the conference room, regarding the tax records are the statements that Defendant seeks to suppress. (Docket No. 18, Ex. 1.)

period of time), and spoke to one other attorney (Gary Wigal).[2] (Tr. P. 100.) The agents did not prevent Defendant from taking the calls and did not inquire regarding the nature of the calls or identity of the callers. (Tr. P. 92, 97.) Mrs. Cason was free to enter the conference room upon her arrival and both she and Defendant were free to exit upon Rollo's arrival. (Tr. P. 77.)

## B. Defendant's Factual Contentions

The following facts are asserted by Defendant and supported through the testimony of Defendant, Shelly Cason, and Edmund Rollo.[3] (Tr. P. No. 65; 80; 101.)

Upon their arrival at his house, the agents advised Defendant that they were there to interview him regarding his client, Mitch Brozak. (Tr. P. 83.) While at the house, with her oldest daughter, Mrs. Cason was followed from room to room by Agent Gandee. (Tr. P. 68.) Further, when Mrs. Cason outright asked the Agents if she and her husband "did something wrong" or needed a lawyer, she was told no and also advised by Agent Gandee that the Agents were investigating Mitch Brozak. (Tr. P. 71.)

Defendant was told that the Agents needed access to his office. (Tr. P. 71.) The Agents told Defendant that if he did not let them in, they would "get in." (Tr. P. 71.) At this point, Defendant agreed to let the Agents into his office. (Tr. P. 71.)

Prior to leaving the house, Mrs. Cason was directed, by the Agents, to retrieve her husband's cellular phone from the upstairs, so he could call his office employee and ask her to leave for the day.

---

[2] Wigal represented another subject of the investigation and came to the office to speak with Wiley, who instructed Cason to speak to Wigal personally. (Tr. P. 115.)

[3] The Government stated on the record that Rollo's testimony will "cause trouble later on, if there's a trial" as counsel to Defendant cannot serve as a witness in a trial. (Tr. P. 101.) The Court noted the Government's objection but proceeded for the purpose of the motion hearing. (Tr. P. 101.)

(Tr. P. 71.) Defendant asked the Agents if they intended to follow him to the office and the Agents told him, "no, you can just ride with us." (Tr. P. 73.)

During the conference room interview, Defendant received two phone calls from Edmund Rollo on Defendant's cellular phone. (Tr. P. 91; 96.) The first phone call prevented Defendant from reviewing the warrant, as the call distracted him. (Tr. P. 91.) During the phone calls, Defendant told Rollo that the agents were simply seeking information about a client. (Tr. P. 103-104.) In contrast, Defendant later called Rollo and was "in a panic" upon learning that he was the subject of the investigation. (Tr. P. 105.)

Once in the conference room at his office, Defendant was not told that he could leave. (Tr. P. 93.) Prior to playing the taped recording, Defendant was not told by the Agents that he was suspected of criminal conduct. (Tr. P. 95.) At no point (neither at the house, nor the office) was Defendant advised of his rights to remain silent, end the interview, or speak to counsel. (Tr. P. 85-86; 87-88.)

## C. The Government's Factual Contentions

The following facts are asserted by the United States of America and supported through the testimony of IRS Special Agents Jason Gandee and Matthew Schommer (Tr. P. 44; 106).

Upon arrival at Defendant's house, Defendant was advised that the Agents were executing a warrant on his office and that he was the subject of the investigation. (Tr. P. 46-47.) At this time, Defendant was advised that he did not have to answer questions and that he could have an attorney present. (Tr. P. 47-48.) Defendant told the Agents that he was "more than willing to talk." (Tr. P. 48.) The Agents did not say anything that would lead Defendant to believe that he was not a subject of the investigation, as doing so would be against standard IRS policy. (Tr. P. 48.)

The Agents insisted upon riding with Cason to the office because additional warrants were being executed throughout Morgantown and the agents did not want to risk officer safety or the destruction of evidence, should Cason notify the other subjects of the investigation. (Tr. P. 112-113.) Agent Gandee testified that he explained this reasoning to Defendant at the time. (Tr. P. 127.)

Inside the conference room, Defendant was once again advised that he was the subject of an investigation and advised of his right to remain silent, his right to leave the conference room, and his right to speak to an attorney. (Tr. P. 58-59.) An interview memorandum, written by the Agents shortly after the interview and submitted into evidence, indicates that Defendant was advised of his rights and told that he was the subject of the investigation at least twice. (Docket No. 18, Ex. 1.)

In addition, Defendant met with the Agents again, with counsel present on July 19, 2010. At this time, Defendant was permitted to review the interview memorandum and while he found a "few inaccuracies," he stated there was "nothing major" that was inaccurate. (Tr. P. 119-120; Docket No. 28, Ex. 2.) Defendant did not object to the memorandum stating that he was advised of his rights or state that this was an inaccuracy. (Tr. P. 119-120.)

## IV.   STANDARD OF REVIEW

When considering a motion to suppress, the Court "may make findings of facts and conclusions of law." United States v. Stevenson, 396 F.3d 538, 541 (4th Cir. 2005). The burden of proof in a motion to suppress is on the proponent of the motion to show, by a preponderance of the evidence, that the evidence in question is inadmissible. United States v. Dickerson, 655 F.2d 559, 561 (4th Cir. 1981) (quoting in Rakas v. Illinois, 439 U.S. 128, 130 (1978)); United States v. Matlock, 415 U.S. 164, 177 (1974). However, "[w]here a defendant seeks to suppress a statement under Miranda v. Arizona, the government bears the burden of establishing by a preponderance of

the evidence that the statement was not the product of custodial interrogation conducted in the absence of Miranda warnings." United States v. Hunter, 63 F. Supp. 3d 614, 619 (E.D. Va. 2014).

It is well established that when a defendant is subject to custodial interrogation, he "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed" before any questioning occurs. Miranda v. Arizona, 384 U.S. 436, 444 (1966). The "safeguards prescribed by Miranda become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam)).

However, such safe guards only apply "when officers elicit admissions by questioning a suspect who is 'in custody.'" United States v. Beard, 119 F. App'x 462, 465 (4th Cir. 2005) (citing Oregon v. Mathiason, 429 U.S. 492, 495,(1977)). "Custodial interrogation refers to 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" United States v. Uzenski, 434 F.3d 690, 704 (4th Cir. 2006) (quoting Miranda, 384 U.S. at 444.) The "operative question is whether, viewed objectively, 'a reasonable man in the suspect's position would have understood his situation' to be one of custody." United States v. Colonna, 511 F.3d 431, 435 (4th Cir. 2007).

## V. DISCUSSION

### A. IRS Administrative Regulations

The Court begins its analysis with Defendant's contention that the Agents failed to follow IRS administrative regulations as this issue can be easily disposed of. Defendant is correct in his assertion that when an agency seizes evidence in violation of its own policies, the Court has a duty

to exclude that evidence. <u>United States v. Heffner</u>, 420 F.2d 809, 811 (4th Cir. 1969). However, no such violation of IRS administrative policy occurred in the case at bar.

Defendant cites to The Internal Revenue Manual ("IRM"), Section 9.4.5.11.3.1.1. (Docket No. 18.). The relevant provisions of this section of the IRM state as follows:

> (1) At the start of the initial interview with the subject of an investigation, a special agent(s) should do the following: . . .
>
> (2) Advise the subject of the investigation as follows: "In connection with my investigation of your tax liability (or other matter), I would like to ask you some questions. However, first I advise you that under the Fifth Amendment to the Constitution of the United States, I cannot compel you to answer any questions or to submit any information if such answers or information might tend to incriminate you in any way. I also advise you that anything which you say and any documents which you submit may be used against you in any criminal proceeding which may be undertaken. I advise you further that you may, if you wish, seek the assistance of an attorney before responding. Do you understand these rights?"

2007 WL 8443138, 1. However, Defendant failed to advise the Court that the very next section of the IRM (9.4.5.11.3.1.2) clearly states: "IRS procedures for non-custodial advice of rights *does not apply to grand jury investigations*. The attorney for the government will provide instructions for advising subjects of their rights." 2007 WL 8443139, 1 (emphasis added).

During the motion hearing on this matter, the government entered into evidence a letter, dated May 28, 2010, signed by Acting Assistant Attorney General John A. DiCicco, designating the investigation of Defendant as a "grand jury investigation." (Docket No. 28, Ex. 1.) As such, under IRM section 9.4.5.11.3.1.2, the policies cited by Defendant do not apply to this matter and the rule of <u>Heffner</u> need not be considered.

**B. Factual Dispute**

The question before the Court is whether Defendant was properly advised of his right to end the interview and whether he was actually in custody during the interview. To answer these questions, the Court must look to the evidence provided by the parties at the suppression hearing. The evidence offered by Defendant and the Government is in direct conflict. As stated, when considering a motion to suppress, it falls to the Court to make findings of fact regarding conflicting evidence. Stevenson, 396 F.3d at 541. As such, the Court must make factual findings regarding the veracity of the testimony and evidence.

The major factual contention before the Court is whether Defendant was advised that he was the subject of the investigation and advised of his rights (the answer to which would considerably alter the context of the interview and inform a reasonable person of whether they were in custody or free to leave). Defendant testified that at no point, prior to the tape being played, was he informed that he was the subject of the investigation, nor was he advised of his right to remain silent, end the interview, or retain counsel. (Tr. P. 85-88.) The Agents testified to the contrary, that Defendant was advised of this almost immediately and on numerous occasions and elected to cooperate regardless. (Tr. P. 46-48.) In addition, shortly following the investigation, the Agents prepared a memorandum recounting the events of June 03, 2010, the first two paragraphs of which state that Defendant was twice advised of his rights and that he was the subject of the investigation. (Docket No. 18, Ex. 1.)

Notably, Agent Gandee testified that on July 19, 2010, Defendant and his attorney Edmund Rollo met with him in Rollo's office. (Tr. P. 119.) During this meeting Defendant and Rollo were shown the interview memorandum and asked if there were any inaccuracies. (Tr. P. 120.) Defendant responded by saying that while there were a few inaccuracies, none of the inaccuracies were "major." (Tr. P. 120.) Agent Gandee documented this exchange in a subsequent memorandum, dated July 19,

2010. (Docket No. 28, Ex. 2.) Defendant offered no evidence or testimony to refute that this meeting occurred or shed doubt on the accuracy of Agent Gandee's version of the events.

As such, the Court accepts Agent Gandee's testimony regarding these events as accurate. It is unlikely that Defendant, while in the presence and under the advisement of counsel, would state that a version of the events that completely conflicts with his own recollection is "nothing major"; especially when the discrepancies are over a matter as critical as whether or not Defendant was told that he was being investigated and whether he was advised of his rights. (Tr. P. 120.) The memorandum even states that Defendant told the agents that he "wanted to talk," when advised of his right not to. (Docket No. 18, Ex. 1.) If this were inconsistent with Defendant's recollection, such a discrepancy would undoubtedly cause a reasonable person to pause and dispute the allegations set forth in the memorandum. Defendant offered no evidence to indicate that he did anything of the sort or rebuke the Government's claim that he reviewed and accepted the memorandum with counsel.

In summation, the Court finds that on July 19, 2010, Defendant was shown written documentation of the events of June 03, 2010, as the Agents testified to them and agreed that this version was mostly accurate with no "major," inaccuracies. (Tr. P. 120.) As such, the Court accepts the Government's version of the events and finds that Defendant was advised that he was the subject of the investigation and that he had the right to consult with counsel, remain silent, and end the interview. (Tr. P. 46-48.)

## C. Nature of the Questioning

Having established that Defendant was advised of his rights, at least in part, the question before the Court becomes whether this was a sufficient warning based on the level of custody that Defendant was in. To be certain, if Defendant were in custody and being interrogated, the Agents

would be required to give him a full Miranda warning prior to questioning him. <u>Miranda</u>, 384 U.S. at 444. However, in lieu of actual custodial interrogation, such safe guards are not constitutionally mandated. <u>Beard</u>, 119 F. App'x at 465. It should be noted that a mere interview with law enforcement, does not rise to the level of coercion needed to invoke the safe guards of Miranda, even if the interview is with the subject of the investigation. <u>Beckwith v. United States</u>, 425 U.S. 341, 347 (1976). As such, it falls to the Court to ascertain whether the interactions between Defendant and the Agents rose to the level of custodial interrogation or was merely an interview.

The Supreme Court has provided guidance on this matter in a similar case. In <u>Beckwith v. United States</u>, two IRS agents went to a suspect's private residence to investigate suspected tax fraud. 425 U.S. at 342-343. As was the case here, the agents identified themselves as agents who were investigating the suspect and provided the suspect with this warning:

> Under the Fifth Amendment to the Constitution of the United States, I cannot compel you to answer any questions or to submit any information if such answers or information might tend to incriminate you in any way. I also advise you that anything which you say and any information which you submit may be used against you in any criminal proceeding which may be undertaken. I advise you further that you may, if you wish, seek the assistance of an attorney before responding.

<u>Id.</u> at 343. The suspect, never-the-less, continued with the discussion and the IRS agents then spent approximately three hours interviewing the suspect in his home. <u>Id.</u> At the conclusion of the interview, the suspect accompanied the agents to his place of employment (although the agents and the suspect traveled separately) to inspect records. <u>Id.</u> at 343-344.

The suspect later claimed that the interview violated Miranda as he was not given his full warning. <u>Id.</u> at 344. However, the Court distinguished an interview of that nature from a custodial

interrogation, finding that:

> An interview with Government agents in a situation such as the one shown by this record simply does not present the elements which the Miranda Court found so inherently coercive as to require its holding. Although the "focus" of an investigation may indeed have been on Beckwith at the time of the interview in the sense that it was his tax liability which was under scrutiny, he hardly found himself in the custodial situation described by the Miranda Court as the basis for its holding.

Id. at 347. The Court draws a clear line between the type of coercive and custodial interrogation faced by the Miranda Court and an interview with a suspect. Id. The Court does acknowledge that there are "special circumstances" in which an interview may become so coercive that it requires the protections of Miranda and states that when such a claim is raised, it falls to the courts "to examine the entire record and make an independent determination of the ultimate issue of voluntariness." Id. at 348 (internal quotations omitted).

Having conducted a thorough examination of the record, the Court finds nothing to indicate that this was either a custodial interrogation or a coercive interview.

### 1. Defendant Was Not In Custody

Custody occurs when "the suspect's freedom of action is curtailed to a degree associated with formal arrest." Park v. Shiflett, 250 F.3d 843, 850 (4th Cir. 2001) (quoting Illinois v. Gates, 462 U.S. 213, 230–31 (1983)). As stated, when making a determination regarding custody, the "operative question is whether, viewed objectively, 'a reasonable man in the suspect's position would have understood his situation' to be one of custody." Colonna, 511 F.3d at 435. This determination is made by considering the totality of the circumstances. Park, 250 F.3d at 850.

The circumstances in this case do not indicate that Defendant believed that his freedom had

been curtailed or that he was being restricted in any way that would cause a reasonable person, in similar circumstances, to believe he was in custody.

One of the very first interactions between Defendant and the Agents consisted of Defendant requesting that the Agents wait on the porch until his youngest daughters had left for school. (Tr. P. 83.) The Agents agreed to this request and waited patiently for approximately three to four minutes. (Tr. P. 83-84; 112.) Accommodating a suspect's request to wait on his porch for nearly five minutes is hardly the type of interaction that would cause a reasonable person to believe that he were being taken into police custody or having his freedom restricted.

Once inside the house the tone did not change so as to indicate that Defendant was being detained or placed into custody. While the agents did inform Defendant that he was the subject of an investigation and that they intended to serve a warrant on his office, there is nothing in the record to indicate that they did anything to restrict his freedom of movement. (Tr. P. 46-47.) However, Defendant relies heavily on two facts in furtherance of his argument that he was taken into custody at this time: (1) the Agents asked Mrs. Cason to retrieve Defendant's cellular phone; and (2) the Agents insisted that Defendant ride with them to Defendant's office. (Docket No. 18.)

Regarding the former, the record reflects that this exchange was nothing more than Agent Gandee requesting that Mrs. Cason retrieve the phone so that Defendant could ask his employee to leave for the day.[4] (Tr. P. 71; 86.) There is nothing in the record to indicate that Defendant attempted to retrieve the phone and was stopped nor is there anything to indicate that there was any type of conduct from the Agents that would cause a reasonable person to believe that he was being restrained

---

[4] This was done to protect Defendant's privacy and avoid information regarding the search from leaking to the public or co-conspirators. (Tr. P. 113.)

from retrieving his phone personally. Agent Gandee simply requested that Mrs. Cason to retrieve the phone and Mrs. Cason complied. (Tr. P. 71; 86.)

Regarding the drive to the office, the testimony reflects that the Agents simply discarded Defendant's suggestion that they follow him in separate cars. (Tr. P. 73; 87.) There is nothing in the record to indicate that Defendant, said no to the Agents, resisted their suggestion, or that the Agents somehow forced Defendant to ride with them. The Agents suggested Defendant ride with them in their car and Defendant agreed.[5] (Tr. P. 73; 87.) A granted request does not rise to the level of restriction needed to establish custody, nor would it cause a reasonable person to believe that he was detained.

Upon arrival at the office, when the interview actually began, the interaction became even less restrictive. Throughout the questioning, Defendant was free to take and make phone calls, leave the room, consult with counsel, and ultimately end the interview. (Tr. P. 77; 92; 97-98; 100.) A reasonable person would not find a situation in which he is free to readily make phone calls on his cellular phone to be the functional equivalent of detention. Furthermore, a reasonable person certainly would not find a situation, in which he is free to end a conversation all together (and does so) to be so restrictive that he would consider himself to be in police custody. As such, the Court finds that Defendant was not in custody on June 03, 2010, nor was he subjected to custodial interrogation. The interaction only ever rose to the level of an interview.

---

[5] The Court acknowledges that the Agents likely would have insisted that Defendant ride with them if Defendant persisted in his request to drive his own car to the office due to the fact that other agents were executing warrants throughout Morgantown and the Agents were concerned about Defendant notifying other suspects. (Tr. P. 113-114.) However, the facts do not suggest that it ever actually came to that: Defendant simply acquiesced to the Agents' request. (Tr. P. 73; 87.)

## 2. Interview Was Not Overly Coercive

As stated, the <u>Beckwith</u> Court found that there are times in which a non-custodial interview can be so coercive that "the behavior of . . . law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined." 425 U.S. at 348 (internal quotations omitted). In such a situation, the Court should consider whether <u>Miranda</u> warnings are given, but only as evidence "on the issue of whether the questioning was in fact coercive." <u>Id.</u> After all, even with a <u>Miranda</u> warning, a coercive interview that includes violence, threats, or improper influence would violate the Due Process Clause in and of itself. <u>United States v. Braxton</u>, 112 F.3d 777, 780 (4th Cir. 1997).

When considering the totality of the circumstances, as the Fourth Circuit has prescribed, there is nothing on the record to indicate that this interview rose to such a level of coercion (or any level of coercion). <u>Id.</u> at 781. The interview took place in Defendant's office, during which time he was free to make or take phone calls. (Tr. P. 100.) He was advised that he could have an attorney present and could end the interview at any time. (Tr. P. 47-48.) Defendant ultimately did just that. (Tr. P. 98.) Nothing in the record indicates that Defendant was threatened or coerced in any way. An interview in which Defendant is advised of his rights, free to make phone calls, and ultimately leave is not so inherently coercive, so as to implicate the Due Process Clause.

Considering this, the Court finds that the Defendant was neither subjected to custodial interrogation nor was the interview coercive. As such, the Court finds that this case is almost identical to <u>Beckwith</u> in which the Supreme Court upheld the unmirandized interview as Constitutional. 425 U.S. at 348. Accordingly, the interview conducted by the Agents in the case at bar is found to be constitutionally permissible. The Agents were under no obligation to provide

Defendant with a full <u>Miranda</u> warning prior to the interview.

## VI. CONCLUSIONS

Due to unrefuted testimony and evidence that Defendant reviewed and accepted the Government's version of the events prior to challenging the evidence, the Court accepts the Government's version of the events to be true. The Court finds that Defendant was advised that he was the subject of the investigation and advised of his right to retain counsel and end the interview. Further Defendant agreed to proceed with the interview of his own volition.

Considering the aforementioned facts and analysis, the Court finds that the Government has shown, by a preponderance of the evidence, that the statements were not the result of a custodial interrogation that was conducted absent of a <u>Miranda</u> warning. <u>Hunter</u>, 63 F. Supp. 3d at 619. The interview never reached a coercive level nor did it rise to the level of custodial interrogation that would warrant Defendant being given a full <u>Miranda</u> warning.

In addition, Defendant's contentions under <u>Heffner</u> are not appropriate because the IRM provides different guidelines for a grand jury investigation, which the investigation of Defendant was classified as. Therefore, the IRM regulations cited by Defendant are non-applicable to the case at bar.

As a result of the above findings, it is hereby **RECOMMENDED** that the Defendant's Motion to Suppress Statement (Docket No. 17) be **DENIED**.

Any party may, within fourteen days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will

result in waiver of the right to appeal from a judgment of this Court based upon such report and recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert</u>. <u>denied</u>, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

The Clerk shall direct copies of this order to counsel for the United States and to counsel for the Defendant.

DATED: August 3 2015

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE